THOMPSON'S POINT, INC., Plaintiff,

v.

SAFE HARBOR DEVELOPMENT CORPORATION, Mark P. Treat and Glen Grant, Defendants.

Glen GRANT, Defendant and Third–Party Plaintiff,

v.

Peter VAN WYCK and Thompson's Point, Inc., Third–Party Defendants.

Civ. No. 93–217–P–H.

United States District Court, D. Maine.

Aug. 12, 1994.

Ralph A. Dyer, Portland, ME, for plaintiffs Thompson's Point, Inc. and Peter VanWyck.

Robert E. Hirshon, Edward J. Kelleher, Drummond, Woodsum, Plimpton & Mac-Mahon, Portland, ME, Marilyn D. Stempler, Kathleen E. Cross, Brown, Rudnick, Freed & Gesmer, Boston, MA, for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HORNBY, District Judge.

### FINDINGS OF FACT

1. In 1984, Glen Grant and Mac Grant, brothers, and Peter Van Wyck, a cousin, formed Thompson's Point, Inc., a Maine corporation, to invest in commercial real estate on Thompson's Point in Portland, Maine. The corporation purchased 28 acres of real estate with improvements on Thompson's Point in 1984, and later added to its holdings.

Glen Grant owned 25% of the shares, Mac Grant owned 25% of the shares and Van Wyck owned 50% of the shares. Each of the three was elected as a director. Van Wyck was elected as president and Glen Grant was elected as vice-president and treasurer.

2. During Maine's real estate boom years of the 1980's, there were no apparent problems in the activities of the corporation. The corporation hired a superintendent who carried on the day-to-day management of the commercial real estate. Van Wyck as president communicated corporate information to Mac Grant who, of the two brothers, was the one primarily interested in the business affairs. Mac Grant, in turn, communicated information to Glen Grant. Although Glen Grant performed some handyman-type work on the premises, he was not intimately involved with the business affairs of the corporation during that period.

3. Difficulties arose later. The Portland, Maine, real estate market deteriorated; Glen Grant and Mac Grant had some kind of parting of the ways; a major building was destroyed by fire on Thompson's Point in 1992; the superintendent was subsequently terminated; and Van Wyck assumed the day-to-day administrative operations of the corporation.

4. Glen Grant concluded that he was no longer receiving appropriate information concerning the corporate affairs and, at the same time, Van Wyck with his newfound intensive involvement decided that he should obtain control of the corporation. By March of 1993, by his own testimony Glen Grant had stopped relying on information Van Wyck provided him.

5. At a dinner meeting on March 20, 1993, Van Wyck announced to Glen Grant his intention to assume control of the corporation by acquiring either Mac Grant's or Glen Grant's shares. He offered Glen Grant $125,000–150,000 for his shares, basically the sum Glen Grant had invested in 1984, not including the later investments he had added for subsequent real estate purchases. Glen Grant believed that his 25% ownership share was worth $300,000–400,000. At the time, Van Wyck on behalf of the corporation was negotiating with prospective purchasers for the sale of an interest in a six-acre parcel at a purchase price in the neighborhood of $300,000. He did not disclose this information to Glen Grant.

6. Glen Grant, without his previous access to information through his brother Mac Grant and being distrustful of Van Wyck, engaged Mark Treat and Safe Harbor Development Corporation to investigate the prospects for Thompson's Point, Inc. in the Portland real estate market in order to gain a better insight into the value of his stock.

7. Treat visited the Portland area and talked with various real estate agents and banks. In the process, he learned that Van Wyck was engaged in active negotiations for the sale of part of the Thompson's Point real estate located north of the railroad tracks that divided the property and that subdivision plans were in progress.

8. Glen Grant was very upset to learn of these subdivision plans and negotiations through Treat rather than directly from Van Wyck. He called Van Wyck, who expressed surprise that Glen Grant had learned of the negotiations. On April 12, 1993, Glen Grant, through his lawyer, demanded a meeting with Van Wyck to have access to all the books and records of the corporation. As a director and treasurer of the corporation, Glen Grant was entitled to full access, and Van Wyck admitted so on the witness stand.

9. On May 3, 1993, Treat and Glen Grant met with Van Wyck at his Thompson's Point office. Van Wyck brought with him a briefcase of papers. During the course of the meeting, which had been called specifically to provide access to the books and papers, Van Wyck provided only four sheets. He called these hand-scribbled notes the corporate ledgers. He briefly handed Treat a current draft of a proposed purchase and sale agreement for a portion of the six-acre parcel north of the tracks, but did not permit Treat the opportunity to read it. He provided access to no other documents, although he claims they were present in his briefcase. He told Treat and Glen Grant that all other material documents concerning the corporation's finances were consumed in the fire. I accept that assertion but also find that Peter

Van Wyck failed to show Treat and Glen Grant any other more recent documents such as subdivision plans and papers reflecting negotiations over the sale of part of the property. The meeting became acrimonious and Van Wyck directed Treat and Glen Grant to leave.

10. Glen Grant and Treat proceeded to pursue their inquiry into the asset value of the corporation and met with a local real estate broker, Thomas Leighton, immediately following their meeting with Van Wyck. Leighton indicated that he had a client who might be interested in purchasing the entire property and asked if he could bring an offer to the corporation. Glen Grant and Treat agreed to present any such offer to the corporation and Glen Grant, as vice-president, signed a buyer/broker agreement. Glen Grant had no authority to sign such an agreement for the corporation. On May 13, 1993, Leighton conveyed to Glen Grant a $2.1 million offer to buy all of Thompson's Point, subject to extensive conditions.

11. In the meantime, Van Wyck, without Glen Grant's knowledge, purchased Mac Grant's 25% ownership interest for $175,000. Before learning of the purchase, Glen Grant had called a board of directors meeting to oust Van Wyck as president and to discuss the overall objectives of the corporation, including whether the corporation should engage in active marketing to sell its entire real estate holdings. When he learned of the sale of Mac Grant's shares, Glen Grant cancelled the meeting and proceeded to file suit in Massachusetts state court, alleging that he had an interest in Mac Grant's shares by virtue of certain loans to his brother and that the transfer was, therefore, a fraudulent conveyance.

12. During the years that the corporation had a superintendent, it paid the superintendent (the evidence did not disclose the amount) but did not pay salaries to the other officers, including the president Van Wyck.

13. In 1993, notwithstanding the shareholders' dispute over control of the corporation, Van Wyck as president decided to pay himself a management fee without seeking approval from the shareholders or directors. He paid himself about $12,000.

14. In the Massachusetts state court litigation over ownership of Mac Grant's shares, Glen Grant paid his own legal fees but Peter Van Wyck, without obtaining any authority to do so, paid his personal legal fees out of corporate funds. He did the same thing in earlier negotiations with the Bank of Boston in a personal attempt to buy the Grant brothers' Note.

15. The corporation had and continues to have a number of building and fire code violations on its old buildings. Some sprinkler systems do not work or must be turned off in the winter because of the risk of pipe freezing. In addition, asbestos abatement contractors hired by the corporation turned out not to be properly licensed and caused a DEP violation.

16. The corporation does not insure all its properties at market value but instead is in part self-insured or underinsured.

17. No evidence was presented that the fire of 1992 was caused or exacerbated by an inadequate sprinkler system or that any of the code violations have caused any financial or economic loss to the corporation. Likewise, no evidence was presented that the building that was destroyed was underinsured.

18. When Van Wyck failed to obtain an environmental assessment requested by Casco Bank (a mortgagee on the Thompson's Point property), Casco Bank commissioned one itself. No resulting damage to the corporate assets was shown.

19. Peter Van Wyck and Glen Grant are irretrievably at odds with one another. Glen Grant has lost all confidence in Van Wyck to make decisions for the benefit of shareholders generally as opposed to his own interests. Van Wyck is convinced that Glen Grant is under financial constraints and that his only goal is to have the corporation liquidated so that he can realize on his assets.

20. After the corporation sued Glen Grant, Treat and Safe Harbor Development Corporation for intentional inference with an advantageous business relationship (a matter the jury decided in the defendants' favor), Glen Grant filed a claim against Thompson's

Point, Inc. seeking its dissolution and against Van Wyck seeking damages for breach of fiduciary obligation.

## CONCLUSIONS OF LAW [1]

### Jurisdiction

■ 1. Glen Grant resides in Massachusetts; Thompson's Point, Inc. is a Maine corporation; and Glen Grant's action to dissolve the corporation puts well over $50,000 at stake. Thus, I have diversity jurisdiction over the claim for dissolution under 28 U.S.C. § 1332.

■ 2. Because Peter Van Wyck resides in Massachusetts, Glen Grant's claim against him for breach of fiduciary duty lacks an independent basis for jurisdiction. This claim, however, forms part of the same controversy at issue in the dissolution action. Thus, I have supplemental jurisdiction to resolve it under 28 U.S.C. § 1367.

### Breach of Fiduciary Obligation

■ 3. According to the Maine Law Court, a corporate director has a duty of care and loyalty to the corporation and its shareholders that includes:

> To disclose and not withhold ... relevant information affecting the status and affairs of the relationship;
>
> . . . .
>
> To not use [his] position, influence or knowledge respecting the affairs and organization that are subject to the relationship to gain any special privilege or advantage over the other person or persons involved in the relationship.

*Rosenthal v. Rosenthal,* 543 A.2d 348, 352 (Me.1988).[2] These duties, in turn, are affected by the business judgment rule, specifically that a court will not second guess the "prudence of particular business decisions honestly reached" on behalf of a corporation; fraud or bad faith is necessary for such an inquiry. *Id.* at 353.

4. Glen Grant claims that Van Wyck breached his fiduciary obligation by attempting to purchase Glen Grant's stock at the March meeting without disclosing corporate financial data, the status of Thompson's Point subdivision plans and the developing corporate opportunity to sell part of its real estate. Glen Grant claims that Van Wyck was motivated by fraud and bad faith.

■ 5. Van Wyck's failure and refusal to disclose information about the negotiations and the subdivision plans as well as his denial of full access to the corporate books and records were a breach of the first duty of loyalty I have quoted from *Rosenthal,* and were made in bad faith following the formal demand for access, not as an exercise of business judgment. The May 3, 1993, meeting was held in response to a letter from Glen Grant's lawyer specifically requesting access to the corporate records. That should have been sufficient to produce full disclosure. It was not up to Glen Grant and Treat to rummage uninvited through Van Wyck's briefcase. Van Wyck deliberately and wrongfully withheld the requested information.

■ 6. With respect to the second duty of loyalty I have quoted from *Rosenthal,* however, Van Wyck's attempt to purchase Glen Grant's stock did not gain Van

---

1. I admitted two pieces of evidence provisionally. Peter Van Wyck's previous criminal conviction in Massachusetts with respect to a wetlands violation has played no role in my decision. The settlement/escrow agreement concerning the Massachusetts litigation has had only the effect noted in Conclusion of Law # 11.

2. Commentators have suggested that *Rosenthal* delineated a unique set of fiduciary duties, some of which pertain only to corporations (and are lifted nearly verbatim from 13–A M.R.S.A. § 716) and some of which (quoted in the text above) pertain only to partnerships. *See* D. Champoux, *Fiduciary Duties of Corporate Directors and Ma-*

*jority Shareholders After Rosenthal,* 7 Me.Bar J. 250, 251 (1992); James B. Zimpritch, *Maine Corporation Law & Practice* § 7.10, at 309–10 (1993). The First Circuit has read the entire list, however, as comprising the duties of shareholders and directors of close corporations. *Slattery v. Bower,* 924 F.2d 6, 9 (1st Cir.1991); *see also* Champoux, *supra,* at 251 (finding fault with *Slattery* for this reason). I am bound by that interpretation. *See, e.g., Taylor v. Canteen Corp.,* 789 F.Supp. 279, 282 (C.D.Ill.1992). In this case the distinction is academic, because Glen Grant has failed to prove that he was damaged by a breach of any of the *Rosenthal* duties.

Wyck any special privilege or advantage. Glen Grant did not in fact accept the offer, and he suffered no damages as a result of it. It is therefore unnecessary to address the business judgment rule on this claim and whether Van Wyck's offer involved fraud or bad faith. The business judgment rule should not apply to this claim in any event, because the rule only protects decisions made at least in part on behalf of the corporation and Van Wyck was acting purely in a personal capacity in attempting to purchase Glen Grant's shares. *See* 13–A M.R.S.A. § 716; *Rosenthal v. Rosenthal,* 543 A.2d at 353 (the business judgment rule concerns decisions about "what course of action best advances the well-being of the enterprise").

7. If the business judgment defense were relevant to this claim, I would find no fraud or bad faith in the amount of Van Wyck's offer. On March 20, 1993, there was no written offer to purchase any portion of the Thompson's Point real estate and discussions were only in the preliminary stages. Although Van Wyck was 95% certain of obtaining approval from the City of Portland to subdivide the small portion that he was seeking to sell, the process was only 50% complete. It is undisputed that even if the sale had gone forward the cost to the corporation of streets, sewers, subdivision plans, etc., would have been in the neighborhood of $100,000. As a result, the net profits to the corporation would have been about $200,000. Glen Grant's share of this value to the corporation would have been only $50,000. It is true that during the 1980's there had been some vague offers for the corporation in the $4–6 million neighborhood, but Glen Grant knew of these offers and no such offers were available in 1993. Indeed, the only offer (produced by Leighton) came later, and was an offer for the entire property for just in excess of $2 million, subject to extensive conditions that would have imposed significant expenses upon the corporation. Even if the property could be liquidated for $2 million, Glen Grant's liquidation share would be only $500,000 (ignoring all expenses involved in liquidation). An offer of $150,000 for his shares in a nonliquidation context is not per se unreasonable given the limited market for minority shares in a closely-held family corporation. There is no suggestion anywhere on the record that Glen Grant's 25% interest could have been sold on the open market in March of 1993 for a higher sum even with disclosure about the negotiations over a portion of the property.

8. Glen Grant has failed to prove his damages resulting from Van Wyck's breach of the first *Rosenthal* duty, the duty to disclose. The two elements of damages he has articulated are $4,111 in legal fees and $3,500 a month paid to Mark Treat for four months. The only part of the legal fees that can fairly be said to be caused by the breach are the fees in drafting the lawyer's letter demanding access to the corporate books and records in early May. Other amounts that he has spent on lawyers in his lawsuit in Massachusetts and other matters, such as reviewing the Leighton real estate proposal and preparing corporate votes to oust Van Wyck and obtain authority to market all the real estate, cannot be said to flow from the breach. Yet the dollar figure for legal fees has not been broken down in any respect. I, therefore, cannot determine any amount (presumably minimal in any event) attributable to the drafting of the letter. With respect to the payments to Treat, Glen Grant engaged Treat and Safe Harbor to determine whether his own estimate of $300,000–400,000 for his 25% ownership share was correct or whether Van Wyck's offer of $150,000 was closer to the mark. There is no indication how access to the corporate books and records or subdivision plans would have avoided the need for Treat's services. Instead, it required Treat's discussion with other real estate professionals and ultimately the Leighton proposal to satisfy Glen Grant as to Thompson's Point's value. As a result, I conclude that Treat's services were for Glen Grant's personal benefit in valuing his shares and determining what goals he wished to pursue vis à vis the corporation. These expenses did not flow from Van Wyck's failure or refusal to disclose the books and records and the subdivision drawings.

9. Accordingly, judgment shall be entered for Peter Van Wyck on Glen Grant's claim for breach of fiduciary obligation.

### Corporate Dissolution

10. Glen Grant seeks dissolution of the corporation on three grounds: (1) shareholder deadlock; (2) fraud or illegality by Peter Van Wyck; and (3) waste or misapplication of corporate assets.

11. I find no ground for dissolution on the basis of shareholder deadlock. First, the shareholder deadlock provision, 13–A M.R.S.A. § 1115(1)(C),[3] is obviously designed for shareholder-managed corporations where there are no directors.[4] *See* James B. Zimprich, *Maine Corporation Law & Practice* § 11.7(a) (1993). This corporation has directors. There are three of them, and there is therefore no likelihood of deadlock. The provision dealing with deadlock among directors is 13–A M.R.S.A. § 1115(1)(A), but it is not the basis for Glen Grant's claim. The third-party defendants, however, have agreed that Glen Grant should be able to proceed under the shareholder deadlock provision because the corporation has effectively been treated as managed by the shareholders. In other words, there have been almost no directors meetings (nor shareholders meetings for that matter). Even if I accept that concession, there is no evidence here "that the corporation is suffering or will suffer irreparable injury, or the business and affairs of the corporation can no longer be conducted to the advantage of the shareholders generally." 13–A M.R.S.A. § 1115(1)(C). Specifically there is no deadlock. At most, Glen Grant owns 25% of the shares and Van Wyck owns 50%. If the sale from Mac Grant to Van Wyck is effective or if a potential settlement agreement of the Massachusetts action takes effect, Van Wyck will have 75% of the shares. Under either circumstance, Glen Grant does not have enough ownership to create a deadlock. That section of the dissolution statute, therefore, does not furnish grounds for dissolution.

12. The various building code violations, the asbestos violation, the sprinkler system problems and the alleged underinsurance do not amount to misapplication or waste of corporate resources. *See* 13–A M.R.S.A. § 1115(1)(E). Old buildings are often subject to building code violation notices and upkeep problems, and owners and managers are constantly faced with bringing them into compliance in an economical fashion. There is no evidence on this record that the violations or problems have reduced the value of the property or caused misapplication or waste of corporate assets. The same is true for the asbestos violation and the levels of insurance coverage. I do not condone building code violations or the use of unlicensed asbestos contractors. Such violations, however, have their own penalties, and there is no evidence that any penalties have been imposed here that might support the conclusion that corporate assets are being wasted so as to justify dissolution. Likewise, the existence of these violations is not the kind of illegality that justifies dissolution under 13–A M.R.S.A. § 1115(1)(D).

13. What may justify dissolution, on the other hand, is the president's blatant self-dealing in the face of shareholder dissension over management. In particular, he has paid himself a management fee of $12,000 without approval of the directors or shareholders (express or otherwise) and has paid his personal legal expenses out of corporate funds without any authority. He did this in the face of a shareholder dispute over control of the corporation while the other shareholder was compelled to pay personally his own legal fees and expenses. This is clearly a misapplication of corporate resources, is contrary to Peter Van Wyck's statutory duties as president and director of the corporation and justifies shareholder loss of confidence in

---

**3.** The court may dissolve a corporation at a shareholder's instance when:

> The shareholders are so divided respecting the management of the business and affairs of the corporation that the corporation is suffering or will suffer irreparable injury, or the business and affairs of the corporation can no longer be conducted to the advantage of the shareholders generally. . . .

13–A M.R.S.A. § 1115(1)(C).

**4.** By its language, 13–A M.R.S.A. § 1115(1)(C) is concerned with shareholder division over the "management . . . of the corporation," suggesting that it deals only with situations in which shareholders control corporate management. Section 1115(1)(B), by contrast, concerns shareholder deadlock in electing successor directors.

his willingness and ability to manage the corporation for the benefit of the shareholders generally.

■ 14. Under Maine law, dissolution is not mandatory but is a matter within the sound discretion of the court. Despite the dissolution claim brought by Glen Grant, it became apparent at closing argument that no party seeks outright dissolution of this corporation and for good reason. Any distress sale of the real estate would harm the economic interests of both shareholders. The value of the corporation can be maximized by waiting for the full flowering of the real estate market and for adequate marketing of the property in question. Although Van Wyck is clearly convinced that Glen Grant seeks only liquidation, I accept Glen Grant's continued assertions that he is interested only in proper management of the corporation and maximization of its value. Neither party would be served by an immediate decree of dissolution followed by a distress sale of the real estate or by a partition that might destroy the value of the property as an integrated piece of real estate.

15. The question before me, then, is what relief to provide in a situation where the president/50% shareholder has misapplied the corporate resources in a fashion that shakes confidence in his management and prevents his remaining in a position of day-to-day control.

16. The parties have proposed to me that I make some type of allocation decision based upon the evidence. Peter Van Wyck would have me order Glen Grant to convey his shares to Van Wyck for a price of $175,000. Glen Grant, on the other hand, would have me order the corporation to transfer to him outright the parcel that was the subject of the purchase and sale discussions in exchange for his shares. Although each side argues its position vehemently, I am satisfied that the evidence does not permit me to determine a value for the corporation, Glen Grant's minority interest or the parcel in

question. Among other things, there is no appraisal and the only offer in the record is a "low ball" offer made by a shrewd real estate developer at a time when the property was not even for sale. That offer was subject to so many conditions that cannot be priced that I cannot derive any confident conclusions about the value of the real estate.[5] Second, the Maine real estate market has apparently reached bottom and begun to turn around. Third, one of the brokers testified at trial that construction of a potential highway interchange would increase the value of some part of the real estate by 10%, but I cannot tell from his testimony whether that is only the smaller parcel or the entire tract. Fourth, I do not know the current status of the Thompson's Point subdivision plans and how that status affects the entire tract. Fifth, I have absolutely no idea of the tax ramifications of these proposals and how they might affect values to the various participants. Consequently, if I were to pursue a forced exchange of stock for real estate or a forced buyout I would require first of all an appraisal of the entire corporate asset, taking into account the value of the real estate and various problems that may be associated with this real estate such as toxic waste. This would obviously take some time and consume some amount of corporate or individual resources.

17. Maine statutes give me the option to consider other remedies short of outright dissolution. Among the remedies is the ability to alter the bylaws of the corporation and/or appoint an independent director for up to two years. 13–A M.R.S.A. § 1123(3)(D), (E). It occurs to me that this remedy may carry some potential. If Mac Grant is no longer to be engaged in the corporate affairs and if Glen Grant and Peter Van Wyck each continue as directors, a third independent director could create the objective voice needed to restore confidence to the management of the affairs of the corporation. In other words, Glen Grant and Van Wyck would each have to obtain the concurrence of

---

**5.** Glen Grant suggests that I can avoid the valuation problem altogether by accepting Van Wyck's evaluation of the relative worth of the parcels north and south of the railroad tracks. No evidence was presented suggesting the basis for these estimates, which were generated only as part of a marketing plan for the property. Thus, I have no grounds for accepting them as an accurate or fair assessment of the parcels' comparative values.

this director to pursue particular objectives. This director, who would report to the court, would have access to the books and records of the corporation; the president would have to maintain complete openness in dealing with him, and therefore with Glen Grant, in order to avoid further judicial intervention. A two-year period might permit the parties to deal with each other and seek some kind of voluntary resolution or permit the corporation to pursue an orderly disposition of its opportunities. I am not sure that there is anyone in the City of Portland or Southern Maine who would willingly undertake this obligation once he or she learned of the disputes between Peter Van Wyck and Glen Grant, but it may nevertheless be an option worth pursuing.

18. Alternatively, given my finding that grounds exist for dissolution, the parties may now be in a position to negotiate their interests with the help of a third-party mediator so that the maximum economic benefit to both could be achieved. Perhaps new management would provide a solution.

19. In sum, I find that there are grounds presented for dissolution, but I am reluctant to order dissolution because it appears not to be in any party's best interests and because the statute permits me to seek steps short of dissolution. I find that I cannot make an allocation of assets, a transfer of shares or a partition on the evidence currently before me.

20. Accordingly, I direct that the lawyers, after consulting with their clients, present to me within forty-five (45) days their position as to whether I should order the appraisal I have described at the expense of the corporation and its shareholders; whether I should pursue the appointment of an independent director as described in 13–A M.R.S.A. § 1123(3)(E); whether I should direct the parties to mediation or ADR; or whether some other option is open to the court given the fact that I have concluded that some judicial intervention is necessary.

SO ORDERED.