**Arnold H. LICHTENSTEIN, Plaintiff,**

v.

**CONSOLIDATED SERVICES GROUP, INC., et al., Defendants.**

**Civil No. 95–34–P–C.**

United States District Court, D. Maine.

Aug. 22, 1997.

Ralph A. Dyer, Portland, Maine, for Plaintiff.

Timothy H. Norton, Kelly, Remmel & Zimmerman, Portland, Maine, for Defendants.

Robert E. Mittel, Peter G. Carey, Mittel, Asen, Eggert, Hunter & Carey, Portland, Maine, for defendants Salterio & Butera.

Thomas A. Cox, Harold J. Friedman, Friedman & Babcock, Portland, Maine, for defendant Jonathan G. Fryer.

## MEMORANDUM OF DECISION AND ORDER

CARTER, District Judge.

This consolidated action is comprised of an individual action (Civ. No. 95–34–P–C) commenced by Plaintiff Arnold Lichtenstein against John Salterio, Peter Butera and Consolidated Services Group, Inc., and a shareholder derivative action (originally filed as Civ. No. 95–170–P–C and later consolidated [1] with Civ. No. 95–34–P–C) also commenced by Lichtenstein against Salterio. There are three counts remaining from the Amended Complaint [2] (Docket No. 27) in Lichtenstein's individual action: Breach of Contract (Count III), Appointment of a Receiver (Count IV), and Dissolution (Count V). The Complaint in the shareholder derivative action (Docket No. 1) consists of two counts: Breach of Fiduciary Duty (Count I) and Appointment of a Receiver (Count IV). The Court finds for Salterio, Butera, and Consolidated on Count III of the individual action, and the Court finds for Lichtenstein on Counts IV and V of the individual action, and for Lichtenstein on Count I of the shareholder derivative action. The Court will dismiss Count IV of the derivative action as moot.

## I. FINDINGS OF FACT

In the early- to mid–1980s, Plaintiff Arnold Lichtenstein and Defendant John Salterio worked together at Coffee Pause, a Massachusetts company that purchased packaged coffee and other products and redistributed them to offices. Tr. Vol. I [3] at 4, 5, 195, 196. In 1986, Salterio left Coffee Pause and started a similar business in Philadelphia called "Caribbean Coffee." Tr. Vol. I at 196.

### Consolidated Services Group

In 1988, Lichtenstein and Salterio went into business together [4] under the name "Consolidated Services Group" [5] (hereafter, "Consolidated"). Tr. Vol. I at 9. Consolidated acted as a broker, purchasing products such as water, water coolers, coffee, and

---

1. See Order on Motion to Consolidate (Docket No. 25).

2. Plaintiff and Defendants have agreed to dismissal of Count I of the Amended Complaint (Order to Permit Inspection of Books and Records). See Trial Memorandum of Plaintiff (Docket No. 132) at 4, n. 1.

3. The Court will refer to the trial transcripts as "Tr. Vol. I" and "Tr. Vol. II."

4. The parties disagree as to the nature and origin of their business relationship. Apparently, Salterio and Lichtenstein had talked about going into business together and at some point, Lichtenstein had presented Salterio with a concept for marketing water and water coolers to office companies. Tr. Vol. I at 8, 197–200, 306. At trial, Salterio denied that they had ever talked about becoming partners. Tr. Vol. I at 198.

 Lichtenstein asserted that in 1988, he and Salterio "created a partnership" called "Consolidated Services Group." Tr. at 9. Salterio testified that it was not a partnership. Tr. at 198. Salterio asserted that they did not discuss ownership at the early stages of the business. Tr. Vol. I at 201. According to Salterio, he owned the business entity created in 1988, and he described it as "my company, my proprietorship." Tr. Vol. I at 242, 307. Salterio testified that after Lichtenstein pitched the idea to him, Salterio agreed that "[Lichtenstein] would work, and I would

pay him and pick up his car payment and expenses." Tr. Vol. I at 200–201, 307.

 Lichtenstein denied that he asked Salterio for work. Tr. Vol. I at 67–68. Instead, Lichtenstein asserted, they began the company together, and they later agreed upon the terms of Lichtenstein's salary and expenses. Tr. Vol. I at 67–68. Moreover, Lichtenstein asserted that ownership of the alleged partnership was divided between himself and Salterio 49% and 51%, respectively. Tr. Vol. I at 11. The record reflects, however, that Lichtenstein never contributed any money to the business or acted in a managerial capacity. Tr. Vol. I at 59, 75.

5. The Court refers throughout this opinion to the business entity created in 1988 as "Consolidated." During the time period relevant to this case, from 1988 until 1991, the parties alternately referred to this same entity as "Consolidated Services Group," (Tr. Vol. I at 9; Plaintiff's Exhibit 9), "Consolidated Services, Inc." (Plaintiff's Exhibit 11), and "Consolidated Services Group, Inc." (Plaintiff's Exhibit 12).

 While the legal status of this entity changed during that time period, the parties apparently used the different names interchangeably. Salterio explained that he "did not put stock in a name," and "absolutely did not pay attention to the name of the company." Tr. Vol. I at 310–11; Tr. Vol. II at 70.

coffee machines,[6] and selling [7] these products, along with training and consulting services, to office coffee service companies.[8] Tr. Vol. I at 8–10, 16–17, 206.

Consolidated had no inventory and no office space of its own, but operated out of Salterio's Caribbean Coffee office in Pennsylvania.[9] Tr. Vol. I at 16, 59–60, 61. Lichtenstein worked out of his home in Rochester, New York, and his work primarily involved traveling to different states, prospecting for sales, and conducting seminars. Tr. Vol. I at 71–72, 176. Lichtenstein and Salterio agreed that Lichtenstein would receive a salary of $500 per week, plus car payments and reimbursement for expenses. Tr. Vol. I at 11. During this time, Lichtenstein received checks drawn from an account in the name of "Consolidated Services Group Inc." Tr. Vol. I at 86–87; see Defendants' Exhibit 6. He also received annual 1099 tax forms.[10] Tr. Vol. I at 75; Tr. Vol. II at 47.

The Court is unable, on this record, to discern the exact amount of Salterio's salary. Salterio testified that he took roughly $20,000 to $25,000 from Consolidated between 1988 and late 1990. Tr. Vol. I at 317. In addition, it appears Salterio and Lichtenstein jointly brokered a sale involving a coffee company, and that Salterio kept a substantial portion, if not all, of the $50,000 commission earned and he put it into his other company, Caribbean Coffee. Tr. Vol. I at 51–52, 113–14, 216–18, 317–18; Tr. Vol. II at 63–64. In his post-trial brief, Salterio contends that he

"went unpaid with occasional exceptions" between 1988 and late 1990.[11] Defendant's Post–Trial Brief (Docket No. 148) at 2.

Salterio agreed to provide start-up capital for Consolidated and apparently did so by way of loans from Caribbean Coffee. Tr. Vol. I at 75, 201–02, 311–12. The amount and dates of all of Salterio's loans are unclear, but the record reflects that there were two checks to "Consolidated Services" from "Caribbean Coffee Co., Inc.," dated August 31, 1989, and October 19, 1989,[12] in the amounts of $10,000 and $5,342.80, respectively. Tr. Vol. I at 201–2; Defendants' Exhibit 31. However, Salterio asserts that he also put money into Consolidated in 1988. Tr. Vol. I at 202. Lichtenstein did not contribute any capital to start up Consolidated. Tr. Vol. I at 75, 312.

Salterio "ran" the business. Tr. Vol. I at 79. Salterio handled the books and records—Lichtenstein did not participate in that aspect of the business. Tr. Vol. I at 59, 79. Tina DeCarlo, the office manager for Caribbean, assisted Salterio with customer billing and signed some of the checks. Tr. Vol. I at 61, 232, 319. Lichtenstein testified that he had no exposure to the billing and bookkeeping, except to the extent that "[Salterio] would tell me from time to time how we were doing verbally." Tr. Vol. I at 59, 61.

On or about May 1, 1988, "Consolidated Services, Inc." entered a contract with Sunroc Corporation, a water cooler business.

6. Consolidated brokered products from water cooler companies, coffee roasters, and other such businesses. Its suppliers included, for example, Sunroc, Liqui Box, New England Tea, and Paul de Lima Coffee. Tr. Vol. I at 10, 22.

7. Consolidated would either buy the products and resell them for a profit or simply broker the products on commission, without buying and selling them. Tr. Vol. I at 321.

8. Consolidated's customers included Web Vending and Woburn Vending, among others. Tr. Vol. I at 10. Lichtenstein estimated that Consolidated had seventeen customers between 1988 and 1990. Tr. Vol. I at 61.

9. Salterio continued to operated Caribbean Coffee at the same time that he operated Consolidated. Tr. Vol. I at 60. He estimated that in early 1988 he devoted roughly 60 percent of his time

to Consolidated and by late 1988, he devoted roughly 90 percent of his time to Consolidated. Tr. Vol. I at 307.

10. Lichtenstein testified that Salterio had advised him to work as an independent contractor for tax purposes. Tr. Vol. I at 75. Salterio asserted that Lichtenstein "preferred" independent contractor status in 1988 and was paid that way each year. Tr. Vol. I at 332.

11. The Court notes that Salterio's inability or unwillingness to provide specific information in this regard impedes the Court in its effort to resolve some of the issues raised herein, and several issues, therefore, remain to be resolved in the dissolution process. See footnote 34, infra.

12. The dates on these checks reflect that they were written during and after the incorporation of Consolidated.

Plaintiff's Exhibit 11 at 1. Lichtenstein signed the contract as "V.P." and Salterio signed as "Pres." Tr. Vol. I at 74, 87, 241–44; Plaintiff's Exhibit 11 at 7. There are three separate sections on the signature portion of the contract, indicating different places for signatures based on whether the business is a corporation, a partnership, or a sole proprietorship. Salterio and Lichtenstein signed under section (1), which indicates that it is the place to sign "If a corporation." Plaintiff's Exhibit 11 at 7. There is a handwritten notation near the signatures, apparently written by Tina DeCarlo, that reads, "Consolidated is doing business under Caribbean until our [Tax] I.D.# comes through." *Id.*

In addition to Salterio and Lichtenstein, Consolidated employed Peter Butera,[13] Salterio's father-in-law, as a part-time telemarketer and George Flower as an accountant. Tr. Vol. I at 11, 60, 318.

*The Incorporation Process*

In or about January 1989, Martin Keefe, another former employee of Coffee Pause, joined the business. Tr. Vol. I at 139–140, 145, 165. It was agreed that Keefe would receive a salary of $500 per week in addition to vehicle and traveling expenses.[14] Tr. Vol. I at 14. Keefe agreed to join the business on the condition that Consolidated be incorporated. Tr. Vol. I at 143–44. Keefe insisted upon incorporating because his prior dealings with Salterio led him to believe he needed some sort of protection: "I wanted to be sure . . . that it [would] be properly funded [and] that [we were] protected financially and employment wise." Tr. Vol. I at 143–44.

Keefe took responsibility for hiring an attorney, Jonathan Fryer, to carry out the process of incorporation. Tr. Vol. I at 144–45, 325–26. Fryer drafted incorporation documents and, over the course of a few months in 1989, Salterio, Lichtenstein, Butera, and Keefe (hereafter, the "incorporators") discussed the documents and agreed upon changes. Tr. Vol. I at 15–16, 146. The documents include:

### 1. *Corporate Formation Agreement*

On or about April 4, 1989, the incorporators signed an agreement entitled "Corporate Formation Agreement." Plaintiff's Exhibit 1 at 6; Tr. Vol. I at 17, 146, 219. According to Salterio, the purpose of the document was "to form a corporation to do the business previously done by Consolidated." Tr. Vol. I at 219. Salterio testified that he intended to set up a corporation. Tr. Vol. I at 221–22.

The Agreement designates Salterio, Lichtenstein, Keefe and Butera as the "incorporators" and states that they "shall immediately organize a corporation to be entitled 'Consolidated Services Group, Inc.' as a Delaware or Massachusetts Corporation."[15] Plaintiff's Exhibit 1 at 1. It provides that the four incorporators will constitute the Board of Directors and designates Salterio as President, Lichtenstein as First Vice President and Clerk, Keefe as Second Vice President, and Butera as Treasurer. *Id.*

Subsection (f) of Section I, entitled "Restriction on Shares," restricts the sale and transfer of shares, ordering that certificates be labeled as follows:

'Any stockholder . . . desiring to sell, transfer or pledge such stock owned by him . . . shall first offer it to the corporation through the Board of Directors, in the manner following: He shall notify the Directors of his desire to sell or transfer by notice in writing, which notice shall contain the price at which he is willing to sell or transfer and the name of one arbitrator. The Directors shall within thirty days thereafter either accept the offer, or by

---

13. It is unclear when Butera began working for Consolidated. However, the record reflects that a check was issued to Butera from "Consolidated Services Group Inc." as early as October 4, 1988. Plaintiff's Exhibit 48A, check no. 1053.

14. Lichtenstein contends that when Butera and Keefe joined, Lichtenstein agreed to give them 6 percent and 15 percent "of [his] shares" in the business. Tr. Vol. I at 11–12, 14. The Court

understands this testimony to mean that Lichtenstein agreed that Butera could have a 6 percent share and Keefe could have a 15 percent share of the business as a whole, as opposed to a percentage of Lichtenstein's own share.

15. Notwithstanding this provision, the Articles of Incorporation were ultimately filed in Maine. *See* Plaintiff's Exhibit 4.

notice to him in writing name a second arbitrator, and these two shall name a third. It shall then be the duty of the arbitrators to ascertain the fair market value of the stock . . .'

Plaintiff's Exhibit 1 at 2–3. After offering the stock to the corporation, the owner may then offer it to the other shareholders, and

'In the event not all of the stock is purchased by either the corporation or the other common shareholders, then the owner shall be at liberty to dispose of same in any manner as he may see fit.

Further, no sale, transfer or assignment may be made by Court order, operation of the law, operation of equity or other voluntary or involuntary action not otherwise covered herein, of any stock without it first being offered to the corporation and other stockholders in the manner set out above. No shares of stock shall be sold or transferred on the books of the corporation until these provisions have been complied with, but the Board of Directors may in any particular instance waive the requirements on behalf of the corporation.'

*Id.*

Section II, entitled "Contributions," states that "the individual contributions of capital, licenses, assets, etc. of each of the parties, shall be set forth in Exhibit 'A' attached hereto, and incorporated herein by reference." Plaintiff's Exhibit 1 at 4. Although Exhibit "A," which is entitled "Contribution of the Incorporators," was attached to the Corporate Formation Agreement, it was left blank. Tr. Vol. I at 85, 327; Plaintiff's Exhibit 1, Exhibit A. At trial, Salterio asserted that there was no agreement, to his recollection, upon how much money would be put into the corporation to capitalize it. Tr. Vol. I at 222, 326–27.

There is no evidence in the record from which to conclude that Lichtenstein or Keefe ever volunteered to contribute, or actually contributed, any money to the corporation after the corporate documents were prepared.[16] Tr. Vol. I at 84–85, 193. Indeed,

both Lichtenstein and Keefe assumed that Salterio would fund the corporation: Keefe's understanding was that "[Salterio] would fund the company to a point of profitability. He assured me that was 5 years, 10 years if that is what it took." Tr. Vol. I at 165; *see also* Tr. Vol. I at 147, 179. Lichtenstein testified that he assumed Salterio continued to fund Consolidated after incorporation in the same manner as he had funded it before the process of incorporation. Tr. Vol. I at 85–86.

Salterio, however, insisted that neither he, nor anybody else, ever put money into the corporation itself:

Q: And you never did put any money into the corporation?

A: No sir.

Tr. Vol. I at 223.

Q: Did anybody ever put money in this corporation?

A: Never.

Tr. Vol. I at 327. According to Salterio, no assets or liabilities were ever transferred from proprietorship to corporation. Tr. Vol. I at 331.

Notwithstanding this testimony, Salterio acknowledged that the incorporators agreed that he would be "one of the money men." Tr. Vol. II at 60. Moreover, he admitted that he or others acting on his behalf made deposits into a bank account in the corporate name:

Q: You had a bank account in the name of the corporation, didn't you?

A: See, I really don't believe that, your Honor.

Q: Did you have a bank account that said on the face of it, it was in the name of the corporation?

A: Yes sir.

Q: Did you put money in that account?

A: I don't even know.

Q: You don't know?

---

16. Salterio suggested that Butera had money to contribute. Tr. Vol. II at 60. However, the record does not reflect that Butera either agreed to contribute, or actually contributed, any capital.

A: I know I had a bank account that said Consolidated Services Group on it but I had that before.

Q: There are checks drawn on that account?

A: Yes.

Q: Where did the money come from?

A: I would think from one account to the other.

Q: My question is: Did you or others acting on your behalf put money into the account that on the face of it says it was in the name of the corporation?

A: In the corporation's name; yes.

Tr. Vol. I at 223–24. The Court notes that Consolidated has had a handful of bank accounts in its various names from 1988 until the present.[17]

Section III of the Agreement, entitled "Issuance of Stock/Transfer of Stock to Voting Trust," states that:

Upon the incorporation of the above-named corporation, stock shall be issued to the incorporators as follows:

| | |
|---|---|
| Salterio | fifty-one (51%) percent |
| Lichtenstein | twenty-eight (28%) percent |
| Keefe | fifteen (15%) percent |
| Butera | six (6%) percent |

Upon issuance of said stock, all incorporators shall transfer their respective shares to a Voting Trust, as set forth in Exhibit 'B' and established this day, after which point such Voting Trust shall control the voting powers and dividend distribution of such shares.

17. Between 1988 and the present, Consolidated has apparently had at least four different bank accounts, according to the following exhibits:

(1) *Plaintiff's Exhibit 48a:*
Checks written to Lichtenstein and Butera from "Consolidated Services Group Inc." in 1988 indicate that Consolidated had an account at PSFS Bank in Philadelphia.

(2) *Plaintiff's Exhibits 49 and 50:*
During the time period that is most relevant to this case (that is, between 1989 and 1990), Consolidated appears to have had at least two separate accounts. A checkbook ledger reflecting checks drawn on an account at Continental Bank in Pennsylvania (in the name of "Consolidated Services Group Inc.") indicates nearly three hundred payments made between November 9, 1989 and June 20, 1990 (check nos. 1001–1239), and between June 25, 1990 and August 8, 1990

Plaintiff's Exhibit 1 at 4. Exhibit "B" was never attached to the Agreement. Plaintiff's Exhibit 1.

Section IV of the Agreement, entitled "Employment Agreement," states that "[t]he incorporators agree that upon incorporation of the above-named corporation, said corporation shall immediately enter into an Employment Agreement, a copy of which is attached hereto as Exhibit 'C,' and which has been executed by all employees." Plaintiff's Exhibit 1 at 4. No Exhibit "C" was ever attached to the Corporate Formation Agreement. Plaintiff's Exhibit 1.

Section VI, entitled "Binding Effect," states that "[t]he provisions of this Agreement shall ... bind the parties [and] supersede and take the place of any provisions of any prior oral and written agreements between the parties...." Plaintiff's Exhibit 1 at 5.

*2. Voting Trust*

On an unspecified date in 1989, the incorporators signed a document entitled "Original Incorporators Voting Trust, Consolidated Services Group, Inc." Plaintiff's Exhibit 2 at 5; Tr. Vol. I at 144–46, 219. Salterio testified that the purpose of the voting trust was to "take control of the organization away from any one person." Tr. Vol. I at 219. The Voting Trust places all of the shares of stock in trust, with Jonathan Fryer as Trustee.[18] Plaintiff's Exhibit 2; Tr. Vol. I at 221.

(check nos. 1302–1309). The Court notes that the ledger pages for June 20, 1990, until June 25, 1990 (check nos. 1240–1301), are missing, and that a new account was opened at the same bank on June 21, 1990, and a sum of at least $4500 was transferred into the new account.

(3) *Defendants' Exhibit 24:*
A check from "Consolidated Services, Inc." in December of 1992 indicates that Consolidated had an account at Family Bank in Massachusetts. *See also* Plaintiff's Exhibit 47.

18. Section I, entitled "Transfer of Shares to Trustee," reads: "Upon incorporation and issuance of stock the shareholders shall assign and deliver their shares or certificates to the Trustee who shall cause the shares represented thereby to be transferred to it as voting trustee on the books of the corporation." Plaintiff's Exhibit 2 at 2.

The record is unclear as to whether the shares were actually transferred to Fryer.[19]

Section V, entitled "Voting Rights," designates votes on decisions other than the disposition of retained earnings as follows: Salterio 2, Lichtenstein 1½, Keefe 1½, and Butera 1. Plaintiff's Exhibit 2 at 4. Salterio testified that he did not recall any meeting of the holders of the voting trust certificates. Tr. Vol. I at 329.

### 3. Employment Agreement

On an unspecified date in 1989, the incorporators signed a document entitled "Initial Employment Agreement of Incorporators of Consolidated Services Group, Inc." (hereafter, "Employment Agreement"). Plaintiff's Exhibit 3 at 10; Tr. Vol. I at 58, 219. The Employment Agreement sets forth amounts of compensation, including salary increases, for the services to be rendered by each of the incorporators.[20] Id. at 5.

While the Agreement states that "the individual responsibilities and duties of the parties shall be set forth" on attached exhibits, the exhibits merely state that:

Because of the start-up nature of Consolidated Services Group, Inc., the parties acknowledge that their duties and responsibilities are difficult to determine, but that each employee shall use his best efforts and shall perform all reasonable services for the promotion of the corporation.

As soon as the corporation is up and running, the parties shall delineate in detail the responsibilities and duties of each employee.

Plaintiff's Exhibit 3 at 1, Exhibits A–D; Tr. Vol. I at 328. Salterio testified that the incorporators never got together to write down specific job descriptions or establish performance targets. Tr. Vol. I at 239, 329. However, Salterio acknowledged that "everybody knew generally" what their functions were. Tr. Vol. II at 65.

The agreement states that "[t]he parties shall, at first meeting of Board of Directors and Stockholders of Consolidated Services Group, Inc., vote to adopt and ratify this Agreement at which time the corporation shall be a party to this Agreement." Plaintiff's Exhibit 3 at 1. According to Salterio, no such meeting took place. Tr. Vol. I at 328. Moreover, Salterio testified that none of the four incorporators ever initiated a vote or made an effort to formally make the corpora-

19. There is considerable mystery as to the issuance, transfer, records, and current status of shares of stock. It appears from the exhibits to the Deposition of Jonathan Fryer, contained in Plaintiff's Exhibit 81, that shares of common stock were issued to each of the incorporators as follows:

Certificate Number 1 certifies that "John G. Salaterio" [sic] is the registered holder of [51] shares of the capital stock of "Consolidated Services Group, Inc.," and is signed by Salterio and Butera and dated September 22, 1989. The back of the certificate is endorsed by Salterio and purports to "sell, assign and transfer" the shares to Jonathan Fryer as Trustee on January 2, 1990. See Plaintiff's Exhibit 81, Exhibit 23 to Fryer Deposition. Salterio testified that he did receive this certificate and that his shares were transferred to Fryer. Tr. Vol. I at 221.

Certificate Numbers 2, 3, and 4 issue 28, 15, and 6 shares to Lichtenstein, Keefe, and Butera, respectively, in the same fashion, on the same date. These certificates also "sell, assign and transfer" the shares to Fryer. Plaintiff's Exhibit 81.

Certificate Number 5 reflects that 100 shares were issued to Fryer on January 2, 1990. Plaintiff's Exhibit 7G. The back of the certificate trans-

fers the shares, in the same manner as the other certificates, to Salterio, Lichtenstein, Keefe, and Butera, in the amounts originally issued, on August 6, 1995. On that date, Fryer apparently returned the certificates, reconveyed his stock power to each of the shareholders, and formally resigned as Trustee. Plaintiff's Exhibit 7A.

The record does not indicate whether the shares were ever entered on the books or canceled (although Exhibit 7A, which discusses the stock transfers, makes a reference to the corporate record book). Moreover, there is no indication as to what became of Keefe's or Lichtenstein's shares or certificates. The Court notes that while Keefe's shares were transferred to Fryer in January of 1990, Keefe had left the company in October of 1989, and Consolidated's ledger reflects that checks were issued to Keefe regularly over the months that followed as "purchase of stock." Plaintiff's Exhibit 49.

20. Salterio's compensation was to be $500 per week plus adjustments. Plaintiff's Exhibit 3 at 5; Tr. Vol. I at 219, 220. Lichtenstein's compensation was to be $500 per week plus expenses and car allowance, to be adjusted as revenue increased. Plaintiff's Exhibit 3 at 5; Tr. Vol. I at 58.

tion a party to the Employment Agreement. Tr. Vol. I at 328.

#### 4. Articles of Incorporation

On or about September 12, 1989, Articles of Incorporation were filed with the Secretary of State for the State of Maine on behalf of the corporation entitled "Consolidated Services Group, Inc."[21] Plaintiff's Exhibit 4 at 1. Salterio informed the incorporators that he had filed with the State of Maine, and that they had become a corporation. Tr. Vol. I at 21. The Articles list "John G. Salaterio" [sic] and "Peter E. Butera" as "Incorporators." Plaintiff's Exhibit 4 at 2. In addition, the Articles authorize the issuance of 100 shares of common stock. *Id.* "Salaterio" [sic] is designated as Clerk, and "Salaterio" [sic], Lichtenstein, Keefe, and Butera are designated as the four Directors. *Id.* at 1.

#### 5. First Meeting of Incorporators and Adopted By-Laws

On an unspecified date, Salterio and Butera signed a document entitled "First Meeting of Incorporators by Unanimous Written Consent of Consolidated Services Group, Inc.," attached to a document entitled "By-Laws." Tr. Vol. I at 221; Plaintiff's Exhibit 5. The document states that:

> The following is resolved by unanimous written consent of all incorporators:
>
> RESOLVED: The By-laws attached hereto are adopted as the By-laws of this corporation and the same shall be inserted into the records of the corporation.
>
> RESOLVED: That *for consideration paid that [sic] the President shall issue 51 shares of stock to John G. Salaterio [sic], 28 shares of stock to Arnold H. Lichtenstein, 15 shares of stock to Martin D. Keefe III, and 6 shares of stock to Peter E. Butera.*
>
> . . .
>
> RESOLVED: That all actions taken by the incorporators prior to this meeting be approved and that the [sic] proceed to

carry on the business for which it was incorporated.

Plaintiff's Exhibit 5 at 1 (emphasis added). The By-Laws provide that "special meetings of the shareholders shall be held whenever the President or the holders of at least 50 percent of all of the shares entitled to vote at the meeting make application thereof to the Clerk, stating the time, place and purpose of the meeting." *Id.*

The incorporators apparently took action to elect themselves to positions as officers. The document representing this action is entitled "Action taken by unanimous written consent of all directors without meeting," and states that the incorporators "hereby . . . take[ ] the following action to serve as the first meeting of directors: Voted to elect the following individuals [sic] to the offices set forth opposite their respective names to serve and hold office until their earlier resignation or removal from office." Plaintiff's Exhibit 6. The incorporators' names are then listed next to their respective positions as officers. *Id.* The positions listed are consistent with the positions designated in the Corporate Formation Agreement, except that "Salaterio" is listed as Clerk, rather than Lichtenstein. *Id.*

Keefe's testimony is ambiguous regarding whether the incorporators held any meetings of shareholders. He stated that "[g]enerally we got together at times we were meeting for appointments and things. We didn't actually—we took an opportunity to hold a meeting, stockholder's meeting." Tr. Vol. I at 146.

*Post-Incorporation Operations*

It is undisputed that the manner in which Consolidated conducted its business did not change in any way after the incorporation documents were signed. Tr. Vol. I at 22, 330. Consolidated maintained a telephone line within the offices of Caribbean Coffee and moved to an office space upstairs in or around October of 1990. Tr. Vol. I at 29, 59–60. Lichtenstein and Keefe traveled extensively, and they both worked primarily out of their homes, as did Butera.[22] Tr. Vol. I at

---

21. The corporation's address is a location in Maine. Plaintiff's Exhibit 4 at 1. Salterio testified that Consolidated's address of incorporation is Salterio's home address. Tr. Vol. II at 72.

22. Lichtenstein and Keefe were, therefore, rarely

60, 71–72, 176. Consolidated continued to use the checking account that Salterio had opened in 1988 in the name of "Consolidated Services Group, Inc."[23] Tr. Vol. I at 330; *see* footnote 17, *supra*. Salterio paid Lichtenstein, Keefe and Butera as independent contractors, issuing 1099 forms for tax years 1989 and 1990.[24] Tr. Vol. I at 332; Plaintiff's Exhibits 14, 15.

### Keefe's Departure

On or about August 3, 1989, Salterio held a meeting of all of the incorporators to discuss Keefe's performance.[25] Tr. Vol. I at 26–27, 165–66, 236. Salterio informed Keefe that Consolidated did not have sufficient funds to continue to pay Keefe his salary.[26] Tr. Vol. I at 165. Keefe worked for approximately two months without pay and then departed the company in October of 1989. Tr. Vol. I at 166, 334. Keefe sent a letter to Salterio, dated October 13, 1989, notifying Salterio that he had not received any formal notice of termination and that he could no longer work without compensation. Defendants' Exhibit 35; Tr. Vol. I at 172. After testifying both that he was "terminated" and that he "resigned," Keefe explained, "I said I could no longer work for nothing." Tr. Vol. I at 172.

Salterio asserted that he eventually paid Keefe for the period of time Keefe had continued to work. Tr. Vol. I at 334–35. Consolidated's ledger indicates that checks were issued monthly to Keefe from December of 1989 until May of 1990, in the amount of $550, for "purchase of stock." Plaintiff's Exhibit 49; *see also* Tr. Vol. I at 335. Salterio claimed he did not recall why he wrote that. Tr. Vol. II at 74. Salterio testified that he was uncertain as to whether Keefe owns his shares today, or whether Keefe had turned the stock back in, and Salterio did not believe that the corporate records reflect whether or not Keefe's stock has been redeemed. Tr. Vol. I at 335; Tr. Vol. II at 74.

### New England Coffee Contract

Until 1990, Consolidated did business with Paul de Lima, a coffee supplier. Tr. Vol. I at 79, 202. The contract between de Lima and "Consolidated Services Inc.", dated January 12, 1988, was not signed, but nevertheless, it controlled the manner in which business was conducted between the two parties. Plaintiff's Exhibit 10; Tr. Vol. I at 310.

In the fall of 1989, Lichtenstein contacted a company called New England Coffee Company.[27] Tr. Vol. I at 80. In the fall of 1989, Salterio, Keefe, and Lichtenstein met with James Feeney, the Vice President of Finances for New England Coffee, to propose a business arrangement between Consolidated

---

present at the location where the bookkeeping and finances were handled. Flower, the accountant, who worked for both Caribbean and Consolidated, came into the office once a month to review the books, often when Lichtenstein was out of town. Tr. Vol. I at 60, 318–19; Tr. Vol. II at 5, 10.

The Court takes special note of the fact that, according to Flower, Salterio told him that Consolidated was a sole proprietorship and apparently never informed him that the company had been incorporated. Tr. Vol. II at 12, 27. Flower testified that he had absolutely no knowledge of any efforts to incorporate Consolidated until reading a letter from the Internal Revenue Service indicating that it intended to audit the corporation. Tr. Vol. II at 12, 27.

**23.** At some point in the 1990s, Salterio opened a new bank account in Massachusetts and began using the name "Consolidated Services Company." Tr. Vol. I at 330–31; *see also* footnote 17, *supra*.

**24.** The Court notes that in 1989, Lichtenstein's 1099 form indicated "Consolidated Services, Inc." as payor, and in 1990, his 1099 form indicated "Consolidated Services" as payor. Plaintiff's Exhibits 14, 15.

**25.** Lichtenstein and Keefe testified credibly that Salterio, sabotaged Keefe by setting up a meeting and instructing everyone except Keefe to come to the meeting prepared to report on his productivity. Tr. Vol. I at 27–28, 165–66. Keefe testified that when he arrived at the meeting empty-handed, he "got the impression that [Salterio] kind of used that to get rid of me." Tr. Vol. I at 166. When Salterio was asked whether he told Butera and Lichtenstein to arrive at the meeting prepared with performance reports, Salterio testified, "Absolutely not. I don't remember that." Tr. Vol. I at 236.

**26.** Salterio testified that as of July 1989, he could no longer afford to pay Keefe. Tr. Vol. I at 334.

**27.** Lichtenstein testified that Keefe played a role in establishing contact with New England Coffee as well. Tr. Vol. I at 28. Keefe is not a party to this action, and the Court, therefore, makes no finding as to Keefe's role in this matter.

and New England Coffee. Tr. Vol. I at 121, 123–24.

In January of 1990, "Consolidated Services Group, Inc." entered a contract with New England Coffee to market and sell New England Coffee. Tr. Vol. I at 23–24, 124; Plaintiff's Exhibit 12. Lichtenstein testified that he helped to negotiate the contract. Tr. Vol. I at 48. The contract was drawn up as an agreement between New England Coffee Company and "Consolidated Services Group, Inc." Plaintiff's Exhibit 12 at 1; Tr. Vol. I at 26; Tr. Vol. II at 70. The agreement is signed by Salterio as "President" of "Consolidated Services Group, Inc." and is dated January 8, 1990. Plaintiff's Exhibit 12 at 5; Tr. Vol. I at 204. However, Salterio testified that he owns the contract personally. Tr. Vol. I at 204. When questioned as to why the contract was signed in the corporation's name, Salterio replied: "[Q]uite honestly, I was using so many names, I don't know; I do not know." Tr. Vol. II at 70. Feeney, who was responsible for negotiating the contract on behalf of New England Coffee, considered Salterio his main contact and had the impression that Salterio "was" Consolidated. Tr. Vol. I at 124–125.

Lichtenstein testified that between eight and fifteen of Consolidated's customers became purchasers of New England Coffee and that the contract was the company's "bread and butter." Tr. Vol. I at 24–25. At trial, the Court heard miscellaneous testimony of indeterminable veracity regarding the value of the New England Coffee contract.[28] While it is clear to the Court that the contract had substantial value, the record is wholly insufficient to allow the Court to make a determination as to its value.

*Filing of Corporate Report*

On or about June 20, 1990, a $60 check was drawn on Consolidated's account to the order of the "Bureau of Corporation," representing a fee for filing a corporate report. Tr. Vol. II at 66; Plaintiff's Exhibit 49, No. 1240. The report, which was apparently filed on May 1, 1990, adds Mary Butera, Peter Butera's wife, as an officer of the corporation. Plaintiff's Exhibit 93; Tr. Vol. II at 66. Salterio testified that he "does not remember" filing the report, nor does he recall adding the name "Mary Butera" as an officer.[29] Tr. Vol. II at 66–67.

*Lichtenstein's Departure*

In or around October 1990, Salterio and George Flower, Consolidated's accountant, informed Lichtenstein that there was no money available to pay his salary and expenses. Tr. Vol. I at 30, 96. Salterio testified that "we met, we talked, and my words to Arnie were: 'This is bad. I don't know what I'm going to do, something has to give.'" Tr. Vol. I at 340. According to Lichtenstein, Salterio "said I could stay if I worked without any money, any job that I got, as long as I paid Consolidated 20 percent of my income I would continue to be part of the operation."[30] Tr. Vol. I at 30. Salterio testified that Consolidated was operating in the red at that time, and that it had $70,000 to $80,000 outstanding in payables.[31] Tr.

---

28. Lichtenstein estimated that the New England Coffee contract is worth between $550,000 and $925,000. Tr. Vol. I at 48–51. Salterio estimated that the value of the contract is between $60,000 and $100,000. Tr. Vol. I at 205. Without additional evidence, these numbers do not assist the Court in determining the actual value of the New England Coffee contract.

29. The Court notes that this testimony, among other highly implausible statements by Salterio, is simply not credible. It is clear from the record that Salterio, or an agent acting on his behalf, wrote the check for the filing fee and submitted the corporate report.

30. Salterio asserted: "I never talked to him about money, never said I would cut his pay or not pay him, nothing like that was discussed." Tr. Vol. I at 341. Salterio did not remember asking Lichtenstein for a twenty percent commission. Tr. Vol. I at 253. The Court does not find Salterio's testimony on this point credible.

31. From this evidentiary record, the Court cannot discern Consolidated's financial situation at that time in order to determine whether the information communicated to Lichtenstein was, in fact, accurate. The record contains a check ledger which indicates monies paid out of an account that was presumably Consolidated's account before and after the incorporation. There is no record of deposits made into that account.

The record reflects that in June of 1990, a new checking account was opened at a Pennsylvania bank in the name of "Consolidated Services Group, Inc." Plaintiff's Exhibit 49. The ledger shows that more than $4,000 was transferred to

Vol. I at 342–43. Salterio conceded that, he "knew if [he] eliminated Lichtenstein, it would free up more cash" with which to survive. Tr. Vol. I at 250.

Lichtenstein testified that Salterio never formally terminated him. Tr. Vol. I at 58, 62. Lichtenstein hired counsel and attempted to negotiate with Salterio regarding the terms of Lichtenstein's departure from Consolidated, the value of his shares, and his ability to continue working in the coffee business. Tr. Vol. I at 31–33. In October of 1990, Lichtenstein's attorney drafted a proposed agreement between Lichtenstein, Salterio, Butera, and Consolidated (referred to as the "Corporation"), which was designed to terminate Lichtenstein's interest in the corporation, on the following terms:

1. Lichtenstein resigns as Vice President, Director and an employee of the Corporation effective as of October 27, 1990.

2. Lichtenstein shall execute a blank stock power conveying any and all interest that he may have in the Corporation back to the Corporation.

3. The Corporation, Salterio and Butera each release Lichtenstein from any and all obligations which Lichtenstein may have to the respective parties and further agree to hold harmless and indemnify Lichtenstein with respect to any obligations of the Corporation.

4. The parties agree that Lichtenstein shall be permitted to solicit, with respect to marketing and sales programs, any customers previously and/or presently serviced by the Corporation.

Plaintiff's Exhibit 22 at 1–2. Salterio and Butera made editing marks, initialing a deletion of ¶ 4, and they signed the agreement in January of 1991 and December of 1990, re-

spectively. Plaintiff's Exhibit 21 at 1–2. Lichtenstein never agreed to the new terms. Tr. Vol. I at 34.

Lichtenstein acknowledged that the proposed agreement states that he *"resigns."* Tr. Vol. I at 102; Plaintiff's Exhibit 22 at 1, ¶ 1. His attorney's letter, attached to the proposed agreement, essentially states the opposite, however, in that it reads: "Please be advised that our office has been retained by Arnold Lichtenstein regarding his *termination* from Consolidated Services Group, Inc." Plaintiff's Exhibit 22.

In any event, Lichtenstein stopped working at Consolidated in November of 1990. Tr. Vol. I at 29–30, 62. It is undisputed that Lichtenstein received his salary and expenses to cover his work up to the time he left. Tr. Vol. I at 31, 75, 109.

In May of 1991, an attorney for Lichtenstein corresponded with Salterio, indicating that Lichtenstein would seek to invoke his rights under ¶ 2(b) [32] of the Employment Agreement, and that Lichtenstein would also pursue his right to sell his shares and dispose of his interest in the corporation. Plaintiff's Exhibit 24. Salterio took the position that the stock had no value and that to the extent the corporation ever operated, it had been abandoned. Tr. Vol. I at 255–56. Lichtenstein decided not to sell coffee and began consulting for customers of Consolidated. Tr. Vol. I at 34.

*Suspension of the Corporation*

Consolidated was officially suspended as a Maine corporation on September 13, 1991, after failing to pay its corporate franchise tax to the Secretary of State in Maine in 1991.[33] Tr. Vol. I at 69, 331.

---

the new account. *Id.* Overall, the trial testimony and exhibits admitted in evidence do not assist the Court in determining Consolidated's net worth during the period in question.

**32.** Paragraph 2(b) of the Employment Agreement states:

(b) *The employee shall have the right on thirty (30) days prior written notice to the corporation to terminate this Agreement . . .*

(i) for cause (cause shall be defined as fraud or embezzlement involving assets of the corpo-

ration, its customers, suppliers, affiliates or licensing authorities, or the corporation's willful breach or habitual neglect of the corporation's obligations under this agreement[) ]

(ii) without cause upon the sale back to the stockholders or corporation of employee's stock . . .

1. after two (2) years of employment . . .
Plaintiff's Exhibit 3 at 3.

**33.** Consolidated apparently paid the corporate franchise tax in 1990. Tr. Vol. II at 69.

## II. DISCUSSION

Most of Lichtenstein's claims hinge on the existence of a corporation. The Court therefore begins with the threshold question of whether Consolidated was ever formed as, and operated as, a corporation. In order to resolve this question, the Court must characterize the nature of Consolidated's business, both at its inception and after the parties' incorporation effort.

### Consolidated's Status Prior to the Incorporation Effort

Lichtenstein argues that Consolidated began as a partnership, with ownership of the business divided between himself and Salterio 49% and 51%, respectively. *See* footnote 4, *supra* Salterio contends that Consolidated has been his own sole proprietorship from its beginning in 1988 until the present.

The record reflects that Salterio and Lichtenstein went into business together in 1988, seeking to combine their skills and ideas. They used several variants of the name Consolidated and identified themselves on occasion as President and Vice President, respectively, although they were admittedly not operating a corporation in the early stages of the business. *See* footnote 5, *supra; see also* Plaintiff's Exhibits 9, 11. Lichtenstein received checks from "Consolidated Services Group, Inc." and was paid as an independent contractor. Defendants' Exhibit 6; Tr. Vol. II at 77. It was agreed that Lichtenstein would receive a weekly salary, car payments and reimbursement for expenses. Tr. Vol. I at 11. Lichtenstein contends that he was not "paid" by Salterio, but rather, he generated his own earnings through sales. However, it was Salterio who handled the finances and "ran" the business. Tr. Vol. I at 59, 79. Moreover, it was Salterio who lent at least $10,000 to $15,000 to the business. Defendants' Exhibit 31. As noted above, the record is unclear as to how much money Salterio took as a salary.[34] From 1988 until 1989, Lichtenstein and Salterio worked together in this manner, along with Peter Butera, who did part-time telemarketing. In 1989, Keefe joined the business and Lichtenstein, Keefe, Salterio, and Butera sought to incorporate Consolidated.

■ Under Maine [35] law, "[e]vidence relevant to the existence of a partnership includes evidence of a voluntary contract between two persons to place their money, effects, labor, and skill, or some or all of them, in lawful commerce or business with the understanding that a community of profits will be shared." *Dalton v. Austin*, 432 A.2d 774, 777 (Me.1981). The definition of partnership includes "co-ownership," which "does not necessarily mean joint title to all business assets," but rather, implies a shared " 'power of ultimate control.' " *Id.* at 777, n. 1. In *Dalton*, the court found that active management of the business was evidence of co-ownership.

■ The record in this case establishes that Lichtenstein played little, if any, role in the management or finances of the business, leaving those matters almost entirely in Salterio's hands. While it was agreed that Lichtenstein would receive a salary and reimbursement for various costs of doing business, there is no evidence of an agreement between Lichtenstein and Salterio to share profits.[36] Indeed, Lichtenstein's busi-

---

**34.** It is also unclear how much Salterio took as a salary after the incorporation. The Court notes that some of the issues to be definitively resolved upon dissolution (see Count V, *infra* ) are: (1) to what extent Salterio has monetarily benefitted from the corporate opportunity in the form of salaries, withdrawals and other payments, and (2) what effect, if any, this should have on the fixing of any distributive value of the corporation Salterio should receive upon dissolution.

Although these may be unusual issues to inject into a dissolution proceeding, it is necessary to do so because this Court is unable to make such a determination on an inadequate record such as this one.

**35.** The Court applies Maine law here, and notes that the parties have not raised a choice-of-law issue with respect to the determination of Consolidated's pre-incorporation status.

**36.** Lichtenstein cites *Lupien v. Malsbenden*, 477 A.2d 746 (Me.1984), as support for his assertion that he and Salterio had an implied agreement to share profits. *Lupien* is distinguishable, however. The court there found evidence of a partnership in that the defendant had the right to, and did in fact, exert control over the business on a day-to-day basis. *Id.* at 748–49. There is no such evidence here, and the Court declines to find an "implied" agreement to share profits.

ness relationship with Salterio was clearly one of dependence, not co-ownership. The Court concludes, therefore, that from 1988 until the point at which the parties sought to incorporate the business, Consolidated was Salterio's sole proprietorship, not a partnership.

*Consolidated's Status After the Incorporation Effort*

■ The Court turns next to the question of whether the parties succeeded in their attempts to incorporate the sole proprietorship. Based upon the trial testimony and the language of the signed Corporate Formation Agreement, the Court is convinced that the parties fully *intended* to incorporate Consolidated. The following pieces of evidence are indicia of the fact that Lichtenstein, Salterio, Keefe, and Butera (the "incorporators") took steps to incorporate and, in fact, conducted business as a corporation:

(1) The incorporators negotiated and signed a series of incorporation documents, including, but not limited to, a Corporate Formation Agreement, a Voting Trust, and an Initial Employment Agreement. Plaintiff's Exhibits 1, 2, 3.

(2) Salterio filed Articles of Incorporation in September of 1989 with the Secretary of State in Maine. Plaintiff's Exhibit 4.

(3) The incorporators issued and placed in trust 100 shares of common stock, to be divided as follows: Salterio 51%, Lichtenstein 28%, Keefe 15%, and Butera 6%. Plaintiff's Exhibit 81, 7(a)-(g); *see* footnote 19, *supra*.

(4) The incorporators elected officers as follows: Salterio as President and Clerk, Lichtenstein as First Vice President, Keefe as Second Vice President, and Butera as Treasurer. Plaintiff's Exhibit 6.

(5) The incorporators conducted business using a checking account in the name of "Consolidated Services Group, Inc." Plaintiff's Exhibit 49; *see* footnote 17, *supra*.

(6) "Consolidated Services Group, Inc." entered into a contract in January of 1990 with New England Coffee Company, and Salterio signed the contract as "President" of the Corporation. Plaintiff's Exhibit 12 at 5; Tr. Vol. I at 204.

(7) Checks were issued to Keefe after he left Consolidated, indicating that they were for "payment of stock." Plaintiff's Exhibit 49.

(8) A corporate annual report was filed in May of 1990 and Salterio signed a check to pay the filing fee. Plaintiff's Exhibits 93, 49; Tr. Vol. II at 66. The report lists Salterio as President, Butera as Treasurer, Lichtenstein as Secretary of the corporation, and adds Mary Butera as an officer. Plaintiff's Exhibit 93.

(9) In January of 1991, Salterio signed a proposed agreement between Lichtenstein, Salterio, Butera, and the "Corporation," in which Lichtenstein was proposing, among other things, to resign and to convey his shares back to the corporation. Plaintiff's Exhibit 21. Salterio signed both in his individual capacity and as "President" of "Consolidated Services Group, Inc." *Id.*

■ Notwithstanding this evidence, Salterio argues that, to the extent a corporation was ever formed, it either did not operate at all or was abandoned. In support of this position, Salterio asserts that the incorporators failed to take several of the steps necessary to form and operate as a corporation, including the most fundamental step of formally transferring assets and liabilities to the corporation. There are indeed gaps and inconsistencies in the efforts to fully *operate* as a corporate entity, and the record reflects that there was no formal transfer of capital from the sole proprietorship to the corporation. However, these flaws are not fatal to Consolidated's legal existence or operation as a corporation, and the Court is convinced that Consolidated was at least a *de facto* corporation, if not a corporation *de jure*. *Baker v. Bates–Street Shirt Co.*, 6 F.2d 854, 856 (1st Cir.1925); *Kidd v. Hilton of San Juan, Inc.*, 251 F.Supp. 465, 468 (D.P.R.1966) (a *de facto* corporation exists where there are "(1) ... laws under which the corporation might have been validly incorporated; (2) a colorable attempt to comply with th[ose] law[s]; and (3) some use or exercise of the corporate privileges.")

*Capitalization of the Corporation*

■ The Court concludes that Consolidated was capitalized as a corporation, to the extent that the parties intended for the corporation to merely subsume the financial apparatus that had belonged to Consolidated in its earlier incarnation as a sole proprietorship. The incorporators apparently failed to attach to the Corporate Formation Agreement Exhibits "A," "B," and "C," which were meant to delineate the capital contributions, to transfer shares of stock to a voting trust, and to make the corporation a party to the Employment Agreement.[37] Moreover, the incorporators never committed to writing any agreement they might have had regarding the capitalization of the corporation.[38]

Notwithstanding the lack of written documentation of the parties' intent regarding capital contributions, the testimony at trial established that there was a general understanding by Lichtenstein and Keefe, and at least a tacit understanding by Salterio, that Salterio would continue to fund Consolidated in the same manner as he had done before the incorporation effort. *See* pages 10–11, *supra.* According to Keefe, Salterio received "51% ownership" [39] in consideration for his promise to fund the corporation. Tr. Vol. I at 147. Salterio acknowledged that as of April of 1989, when they undertook to incorporate Consolidated, the business already had some "worth," and it was agreed that he would receive 51% of the shares to reflect the worth of what he had already contributed. Tr. Vol. II at 58–59 (witness affirming deposition testimony).

Nevertheless, Salterio contends that the corporation had no equity and did not operate the business because the incorporators never undertook to formally transfer the assets and liabilities from the sole proprietorship over to the corporation. The Court disagrees. Formally capitalizing the corporation by way of a bill of sale or other formal documentation of transfer of ownership was unnecessary in this instance. The parties clearly intended to operate as a corporation, and implicitly assumed in the corporate form the assets and liabilities of the pre-existing operation.

The existing case law regarding capitalization in the corporate-veil-piercing context is helpful in determining what form and amount of capitalization is required to form and operate a corporation. The Court in *J–R Grain Co. v. FAC, Inc.,* 627 F.2d 129 (8th Cir.1980), noted that:

> 'Inadequate capitalization' ... means capitalization very small in relation to the nature of the business of the corporation and the risks the business necessarily entails. Inadequate capitalization is measured at the time of formation of the corporation. A corporation that was adequately capitalized when formed but has suffered losses is not undercapitalized. Whether a corporation is undercapitalized ... presents a question of fact that turns on the nature of the business of the particular corporation.

*Id.* at 135; *see also In the Matter of Twin Lakes Village, Inc.,* 2 B.R. 532, 541, n. 2 (Bankr.D.Nev.1980) (where state has no statutory standard for adequate capitalization, "no actual capitalization need take place before a corporation enters its corporate 'existence' so as to do business within th[e] state and accrue corporate obligations"); *In re Vermont Toy Works, Inc.,* 135 B.R. 762, 771 (D.Vt.1991) (measuring adequacy of capital at

---

37. The Court will discuss the effect of the incorporators' failure to refine the terms of, and to ratify, the Employment Agreement in section (2) of its analysis on Count III, *infra.*

38. There is no reliable evidence in the record as to whether Exhibits A–C of the Corporate Formation Agreement ever existed, or whether their absence reflects a genuine inability to reach an agreement on capital contributions and other matters. After hearing the evidence in this case, the Court concludes that the absence of the exhibits is most likely due to a combination of incompetence and highly questionable business practice. The Court is persuaded that Salterio intentionally avoided attaching the exhibits in order to avoid the corporate form, while Lichtenstein's failure to complete the documentation was more likely due to a lack of business acumen.

39. The Court interprets this to mean 51% of the common stock. Keefe also testified that Salterio was to receive 60% of "residual income," which was income from one-time programs, sales and seminars, or income from the sale of the company itself in a merger or acquisition. Tr. Vol. I at 147.

time of formation of corporation "based on the nature of the business and the size of the corporate undertaking"). Consolidated was a distributorship, which involved few risks, and as Lichtenstein asserted, required few hard assets to operate.[40] The incorporators all worked to generate sales, and salaries and expenses were to be paid with the income derived from the sales generated.

Maine law does not require a minimum amount of capital to form a corporation. The Articles of Incorporation authorize the issuance of 100 shares of common stock of no par value. Plaintiff's Exhibit 4 at 2. According to the Maine Business Corporation Act, "[s]hares without par value may be issued for such consideration as may be fixed from time to time by the board of directors unless the articles of incorporation reserve to the shareholders the right to fix the consideration." 13-A M.R.S.A. § 506. The Corporate Formation Agreement states that "the incorporators ... collectively desire to combine [their] experience, expertise, licenses and assets to form a corporation...." Plaintiff's Exhibit 1 at 1. Lichtenstein asserts that it is these intangible assets, rather than hard assets, that were brought together to "capitalize" the corporation.

The Court concludes that Consolidated was, in fact, capitalized, at least implicitly, by virtue of the fact that the corporation took over the existing business. The net worth of the existing business became the net worth of the corporation, and the value of the shares corresponded to the value of the existing business entity.

*Indicia of a Failure to Form or Operate as a Corporation*

In support of his position that Consolidated never operated as a corporation, Salterio additionally asserts that (1) no bank account was opened, (2) no corporate tax returns were filed, (3) no meetings were held, and (4) Lichtenstein, Keefe and Butera were paid as independent contractors. The Court is not persuaded by this argument and will address each point in turn:

### 1. *Bank Account*

Salterio argues that the corporation never opened a bank account. The record reflects that between 1988 and 1990, Consolidated used *at least* three different bank accounts in Pennsylvania. *See* footnote 17, *supra*. It appears that a new account was, in fact, opened in June of 1990 and that a sum of at least $4,500 was transferred into that account. Plaintiff's Exhibit 49.

Of the four incorporators, Salterio was the individual who handled banking matters from the outset; his failure to formally establish a corporate banking account should not now enable him to deny the existence of the corporation. Consolidated's funds were, in fact, deposited and withdrawn from a pre-existing bank account (an account which, the Court emphasizes, was in the *corporate* name already), which is strong evidence of the incorporators' mutual acceptance of the legal existence and operation of the corporation.

### 2. *Corporate Tax Returns*

After the incorporation, Salterio continued to file Consolidated's taxes on his personal tax return[41] as a sole proprietor-

---

40. Lichtenstein points out that the assets of a brokerage business such as Consolidated consist of the company name, contracts entered with other businesses, inventory such as water bottles, and cash in a checking account.

It is undisputed that business was conducted in the same manner after incorporation as it had been prior to the signing of the documents. Lichtenstein, for example, continued to conduct his sales efforts out of his home and on the road and was reimbursed for his expenses.

41. The Court notes that Defendant refers to Plaintiff's Exhibits 38 through 43A as Salterio's "edited" tax returns. *See* Defendant's Post-Trial Brief (Docket No. 148) at 6. The Internal Reve-

nue Service performed an audit in 1990 and concluded that "no change is necessary in your reported tax." Defendants' Exhibit 28. The record does not reflect whether this was a "line by line" audit or a "full" audit, and Plaintiff's witness Bilodeau, an accountant, testified that a "line by line" audit resulting in no change would "not give [her] much confidence" in the accuracy of a tax return, whereas a "full" audit with no change would give the tax return "a little more credibility." Tr. Vol. I at 298.

In any event, the Court concludes that Salterio was clearly duplicitous in some respects, since the record reflects that he never even informed his own accountant that the company had undertaken to incorporate itself. Tr. Vol. II at 12, 27.

ship, and he directly informed the Internal Revenue Service that he was operating a sole proprietorship. Plaintiff's Exhibits 38A–43A; Defendants' Exhibits 1, 2. Salterio cannot rely on the fact that he *chose* to report Consolidated business on a 1040, Schedule C, from 1988 until the present, as evidence that Consolidated was not a corporation.

### 3. *Shareholder Meetings*

■ As for Salterio's assertion that there were no shareholder meetings, it appears that the incorporators did take action to elect directors on written consent without a meeting. Plaintiff's Exhibit 6. Moreover, while there is no evidence the incorporators ever convened a special meeting, it appears from the bylaws that *only* Salterio, as President and 51% shareholder, was empowered to convene a special meeting.[42]

### 4. *Independent Contractors*

■ The record reflects that Lichtenstein, Keefe and Butera were paid as independent contractors. Plaintiff's Exhibits 14, 15; Tr. Vol. I at 332. The Court notes that the "payor" on the 1099 forms for 1989 is "Consolidated Services Inc.," whereas in 1990, it is "Consolidated Services." Plaintiff's Exhibits 14, 15. The Court is not persuaded that this evidence is in any way probative of whether Consolidated operated as a corporation.

None of these factors, alone or together, convinces the Court that Consolidated was not formed or operated as a corporation. Salterio knowingly participated in the incorporation process. While he agreed to relinquish some control of the business in the form of voting, and while the corporate documents suggest that the business was to be managed by the Board of Directors, Salterio, continued to operate as the dominant force in the management and financing. To the extent that the bank account or filing of taxes

did not reflect Consolidated's status as a corporation, the Court finds that these corporate operations were within Salterio's control. Based upon these facts, Lichtenstein argues, and well-settled precedent in Maine supports the argument, that Salterio is estopped from denying that a corporation existed:

> The plaintiffs . . . contend that the [corporation], though authorized to exist, never in fact did exist, or if it ever breathed, it at once ceased to breathe; that it cannot now be regarded as an existing corporation or party in any proceedings. They claim that no meeting has been held since that organization, that the trustees never had a legal meeting for want of a quorum, hence there was never a legal board of executive officers, that there never was a legal meeting of even a *de facto* board. The plaintiffs, however, took part in the organization, took part in the meeting of the trustees, took office under the trustees, acted as such officers, drew the stipends appropriated to the corporation. *Any irregularities or omissions in the matter of meetings . . . the plaintiffs are more or less responsible for. They are clearly estopped now from denying the existence of the authority they invoked, and under which they assumed to act.*

*Beal v. Bass,* 86 Me. 325, 335, 29 A. 1088 (1894). Accordingly, the Court concludes that Consolidated was formed as, and operated as, a corporation, at least from the filing of the Articles of Incorporation in 1989 until 1991, when it was officially suspended by the State of Maine.

### A. INDIVIDUAL CLAIMS

*Count III: Breach of Contract*

Lichtenstein asserts claims for breach of contract against Salterio, Butera[43] and Con-

---

42. The By-laws provide that "Special meetings of the shareholders shall be held whenever the President or the holders of at least 50 percent of all of the shares entitled to vote at the meeting make application thereof to the clerk, stating the time, place and purpose of the meeting." Plaintiff's Exhibit 5, Article III, § 3. The section entitled "Voting at meetings," states that "Every holder of the capital stock of the Corporation

shall be entitled to one vote for each share of capital stock standing in his name on the books of the Corporation." *Id.* at § 6(1).

43. Lichtenstein bases his claim against Butera on his assertion that Butera had a fiduciary duty as a shareholder to protect the interest of other shareholders from oppression by Salterio, the majority shareholder. Assuming, *arguendo,* that

solidated or alleged breach of: (1) the Corporate Formation Agreement and (2) the Employment Agreement. The Court will address each claim in turn.

### 1. *Corporate Formation Agreement*

■ Lichtenstein seeks $596,532 in damages from Salterio on the grounds that Salterio breached the Corporate Formation Agreement by diverting Consolidated's profits for his personal benefit and by failing to capitalize the corporation. In construing a contract, a court should:

> give effect to the intention of the parties as gathered from the language of the agreement viewed in light of all the circumstances under which it was made.... Such intention must be gathered from the written instrument, construed in respect to the subject matter, the motive and purpose of making the agreement, and the object to be accomplished.

*Hodgkins v. New England Telephone Co.*, 82 F.3d 1226, 1230 (1st Cir.1996) (citing *Baybutt Constr. Corp. v. Commercial Union Ins. Co.*, 455 A.2d 914, 919 (Me.1983), overruled on other grounds, 564 A.2d 383 (Me.1989)). The Court concludes, as an initial matter, that the Corporate Formation Agreement is a valid contract. It was signed by all of the incorporators with the intent to form a corporation and is incomplete only insofar as there are no exhibits attached.

Lichtenstein alleges that Salterio contracted to convey the assets of the former venture to the new corporation. The record contains no written documentation of a promise by Salterio to capitalize the corporation. The trial testimony established that Lichtenstein and Keefe had a general understanding, and Salterio tacitly agreed, that Salterio was to be "one of the money men" in that he would provide some money to assist the business in its fledgling state. However, there is simply no evidence of how much capital Salterio would contribute up front or for how long he would continue to provide working capital. Even assuming the Court could discern more specifically the terms of Salterio's promise, the evidentiary record is insufficient to prove Lichtenstein's claim because it is unclear how much money Salterio did, in fact, contribute.[44]

■ While the record permits the Court to conclude that Consolidated was a *de facto* corporation in that it operated through the pre-existing apparatus of Salterio's sole proprietorship, the Court cannot discern the specific intentions of the parties with respect to capitalization. The Court simply cannot conclude, on these facts, that Salterio breached the Corporate Formation Agreement by failing to provide start-up capital.[45]

---

Butera had such a duty, there is simply no evidence in the record from which the Court can infer that Butera breached that duty or breached any agreement he made with Lichtenstein. Hence, the Court concludes that Lichtenstein has failed to prove his claim for breach of contract against Butera on Count III of the individual action.

**44.** The Court is uncertain as to why Plaintiff agreed to dismiss Count I on inspection of the corporate books and records. Pursuit of that claim might have provided Plaintiff with an opportunity to prove a claim such as this one.

In the absence of Count I, however, this Court is left to make determinations on the basis of the inadequate evidentiary record now before it. This record is a mere patchwork of check stubs and other materials which do not begin to provide an accurate picture of Consolidated's finances during the period in question. Plaintiff concedes as much in his post-trial brief, where he addresses the related issue of valuation of the corporation:

Assuming that there was a valuation to be made in 1990, that appraisal has to take into consideration the assets, including cash in the bank, receivables from customers, the $10,000 receivable from Caribbean Coffee, the intangible value of distribution contracts and the intangible good will value derived from the customer base. *There is no testimony presenting this evidence.*

Plaintiff's Post–Trial Reply Brief (Docket No. 149) at 18 (emphasis added).

**45.** The Court, therefore, does not reach the issue of whether arbitration to determine the value of his shares was Lichtenstein's exclusive remedy. The Court is compelled to point out, however, that if the Court were to reach the remedial aspect of this claim, it is clear that Lichtenstein made a genuine attempt to tender his shares back to the corporation under terms of the Corporate Formation Agreement. Plaintiff's Exhibit 1 at 2–3. While he did not name an arbitrator or set a price, he did make a good faith offer. Salterio rejected the offer on the ground that the corporation was not capitalized. Tr. I at 256.

It would be circular, indeed, to allow Salterio to reject the offer of shares on the very same

### 2. The Employment Agreement

 Lichtenstein asserts that Salterio[46] breached the Employment Agreement by terminating him without cause, and he seeks $85,077 in damages for lost income.[47] Salterio responds that the Employment Agreement was never ratified, and that, even assuming it is an enforceable agreement, Lichtenstein is not entitled to damages for breach of contract because he quit.[48] The record reflects that the parties did not ratify the Employment Agreement or refine its terms to include specific duties and responsibilities; however, it is clear that "everyone knew generally," what their duties were. Tr. Vol. I at 239, 329; Tr. Vol. II at 65. The Court finds, therefore, that the Employment Agreement constitutes a valid contract as between Lichtenstein and Salterio.[49] For the reasons stated below, the Court concludes that Salterio did, in effect, terminate Lichtenstein "without cause," yet this action does not constitute a breach the Employment Agreement.

Under a section entitled "Term of Contract," the Employment Agreement states that it "shall continue until terminated as set forth below." Plaintiff's Exhibit 3 at 1. Paragraph 2 provides that either the corporation or the employee has the right to terminate the contract upon thirty days written notice, either "for cause" or "without cause," under certain conditions. Plaintiff's Exhibit 3 at 2–5. With regard to the corporation's right to terminate the contract, ¶ 2(a) provides that:

a. *The corporation shall have the right* on thirty days (30) days prior written notice to the employee *to terminate this Agreement* as to his employment for the following reasons:

. . .

(ii) for cause (cause shall be defined as fraud or embezzlement involving assets of the corporation, its customers, suppliers or affiliates, the employee's conviction of a felonious criminal offense, or the employee's willful breach or habitual neglect of the employee's obligations under this Agreement);

(iii) *without cause*, with retirement payments to the employee as follows:

1. after two (2) years of employment, twenty (20%) percent of employee's annual gross salary for a period of twenty years;

2. after four (4) years of employment, thirty (30%) percent of employ-

---

ground for which Lichtenstein sought to reconvey his shares (*i.e.*, that Salterio had failed to capitalize the corporation) and then to rule that there is no remedy available to Lichtenstein on the ground that he failed to properly tender his shares under the Agreement.

**46.** Lichtenstein brings this claim against Salterio, Butera and Consolidated. The analysis here applies only to Salterio, and the claims against Butera and Consolidated will addressed at page 21, *infra*.

**47.** This number is derived from Deborah Bilodeau's calculations. *See* Plaintiff's Exhibit 37G. The Court admitted page 2 of Bilodeau's Exhibit *de bene* (*see* Tr. Vol. I at 277) and now finds that the issue of its admissibility is moot, in view of the fact that the Court finds no breach of the Employment Agreement.

**48.** Defendant argues that, in any event, Plaintiff is not entitled to damages because he agreed to limit his remedies under the Employment Agreement and arbitration was his "exclusive remedy." The Court disagrees.

Based upon the language of this agreement, the Court concludes that the parties did not intend for arbitration to be the sole remedy but, rather, an "option." *See Nelson v. University of Maine System*, 914 F.Supp. 643, 651 (D.Me.1996) (where contract is such that parties "need not opt for arbitration at all," arbitration provision was not exclusive remedy; arbitration was "final and binding" on parties only when they chose to pursue it rather than another avenue of dispute resolution).

**49.** The Employment Agreement states that "the parties shall, at the first meeting of the Board of Directors and Stockholders of the Consolidated Services Group, Inc., vote to adopt and ratify this Agreement at which time the corporation shall be a party to this Agreement." Plaintiff's Exhibit 3 at 1. The record reflects that there was no such vote or ratification and that the corporation was not made a party to the agreement. While this language does not affect the existence of an agreement between Salterio and Lichtenstein, the Court concludes that Consolidated was not a party to the agreement, and the Court further concludes, therefore, that Lichtenstein has failed to prove his claim for breach of contract on Count III against Consolidated. To the extent that Salterio's actions represent the actions of the corporation, the Court deals with those actions in its analysis of the claim against Salterio.

ee's annual gross salary for a period of twenty years...

*Id.* at 2, ¶ 2 (emphasis added). Paragraph 2(c) states that "In the event of any of the parties' desire to terminate this Agreement, such party desiring termination shall give written notice to the other party of the reasons for termination...." *Id.* at 3–4.

Lichtenstein testified that Salterio never formally terminated him. Tr. Vol. I at 58, 62. However, Lichtenstein argues that he was forced to leave Consolidated, in that he was told he would no longer receive a salary. After meeting with Salterio and Flower, and learning that the Corporation was losing money, Lichtenstein chose to stop working for Consolidated because he could not afford to work without a salary.[50] He left the business in November of 1990. Tr. Vol. I at 29–30, 62. He received a salary and expenses to cover all of the work he did until he left. Tr. Vol. I at 31, 75, 109. Beginning in October 1990, Lichtenstein attempted to negotiate with Salterio in order to settle his shares and to secure his right to continue to sell coffee. Tr. Vol. I at 31–33. In May of 1991, Lichtenstein's counsel gave notice that Lichtenstein intended to pursue his own right to terminate the agreement under ¶ 2(b). *See* footnote 32, *supra; see also* Plaintiff's Exhibit 24.

■ The Court concludes, based upon the testimony at trial, that Salterio constructively terminated Lichtenstein by communicating to him, either directly or through Salterio's agent, Flower, that the corporation could no longer afford to pay his salary. This action does not constitute a breach of the Employment Agreement, however. The contract specifically provides that the corporation may terminate an employee without cause.[51] Plaintiff's Exhibit 3 at 2, ¶ 2(a)(iii). The contract makes no provision for a termination "without cause" during an employee's first two years of employment, and there was no testimony at trial to indicate whether the parties intended for the provision in ¶ 2(a)(iii) to apply to a situation such as this one. The Court is persuaded that 2(a)(iii) was intended to and does encompass this situation, however, because the Court construes the provisions in 2(a)(iii)(1)-(5) as merely delineating *benefits* to be received upon terminations without cause, by describing the method for calculating retirement payments for employees who have worked between two and ten years. The Court does *not* interpret this language to *exclude* employees who have worked less than two years from the overall provision that the corporation may terminate an employee without cause. The corporation clearly has the right, under 2(a)(iii), to terminate an employee without cause.

■ While the contract specifies that such termination must be upon written notice, the notice provision was essentially met in these circumstances. The effect of the notice provision is to inform the employee or the corporation of the action being taken by the other party. In this case, Lichtenstein acknowledged that he was on notice, as of October, that the corporation would no longer be able to pay his salary. He felt that he was forced to leave, and he chose to stop working at some point in November. Lichtenstein makes no argument that he should be entitled to any damages for the specific interval between the meeting with Salterio and Flower and the date he left. Hence, the Court finds that Lichtenstein was given notice, and that Salterio, in effect, terminated Lichtenstein "without cause," in accordance with the provisions in ¶ 2(a)(iii).

Salterio contends that there is no evidence that either Salterio or Flower *knew* that Flower's statement regarding the state of Consolidated's finances was untrue. The Court is unable, on this record, to discern the veracity of the information conveyed to Lichtenstein.

---

50. Flower and Salterio apparently met with Lichtenstein and told him that there was no money left with which to pay his salary. Flower testified at trial that he prepared a balance sheet, Defendants' Exhibit 34, demonstrating that Consolidated's accounts payable exceeded its receivables by $70,000 at that time. Tr. Vol. II at 16–18. Lichtenstein asserts that this evidence does not demonstrate that Consolidated had a negative value in 1990, since Flower did not assert that the balance sheet he used represented a complete picture of Consolidated's finances.

51. It is clear that Salterio's actions do not amount to a termination "for cause," under ¶ 2(a)(i).

Lichtenstein has, therefore, failed to prove any breach of the Employment Agreement by Salterio. In addition, the Court concludes, for the reasons articulated in footnotes 43 and 49, *supra,* that Lichtenstein failed to prove that either Butera or Consolidated breached the Employment Agreement. The Court will, therefore, find for Salterio, Butera and Consolidated on Count III.

*Count V: Dissolution*

■■■■ Lichtenstein seeks dissolution of the corporation pursuant to 13–A M.R.S.A. §§ 1115(I)(D) and (E) on the grounds of (1) fraud or illegality by Salterio and (2) waste or misapplication of corporate assets.[52] "Under Maine law, dissolution is . . . a matter within the sound discretion of the court." *Thompson's Point, Inc. v. Safe Harbor Development Corp.*, 862 F.Supp. 594, 602 (D.Me.1994).

The evidence shows that between incorporation in 198% and September of 1991, when the corporation was suspended,[53] Salterio held himself out to customers as President of the corporation, and yet he admittedly treated the business as a sole proprietorship for tax purposes. For example, Salterio, entered into the New England Coffee contract in January of 1990 as "President" of "Consolidated Services Group, Inc.," and yet, he filed tax forms for Consolidated as a sole proprietorship,[54] thereby treating the commissions from New England Coffee as income from a sole proprietorship.

The definition of "fraud," under the Maine Business Corporation Act, states that it is "not limited to common-law deceit." 13–A M.R.S.A. § 102(12). The Court finds that Salterio's actions in treating the business opportunity of the corporation, for purposes of his own tax filings and for other purposes, as his "sole proprietorship" assets, and his concealment of these actions from the other shareholders, constitutes both fraud and a misapplication of the assets of the corporation.[55] The Court finds that grounds for dissolution of the corporation exist under either § 1115(1)(D) or (E), and the Court will, therefore, order that the corporation be dissolved.

*Count IV: Appointment of a Receiver*

■■■ Plaintiff argues that the Court should appoint a receiver to complete an accounting of the business, pay creditors and distribute the balance to the shareholders. The Court has the authority, under 13–A M.R.S.A. § 1123(E), to appoint a receiver in an action for dissolution under § 1115. Based upon the evidence, the Court concludes that appointment of a receiver is appropriate in these circumstances. The Court reserves for future determination, as the result of further proceedings herein, (1) the appointment of a specific person to serve as such receiver; (2) the specification of the terms and conditions of the appointment, pursuant to Maine law; and (3) the determination of powers and duties to be conferred upon the receiver.

### B. SHAREHOLDER DERIVATIVE CLAIMS

*Count I: Breach of Fiduciary Duty*

The Maine statute governing corporations defines the fiduciary duties of an individual in Salterio's position as follows:

---

**52.** The Court is empowered under 13–A M.R.S.A. § 1115(1)(D) and 1115(I)(E) to:

"decree the dissolution of, and to liquidate the assets and business of, a corporation:
(1) In an action filed by a shareholder in which it is established that:
. . .
(D) The acts of the directors or those in control of the corporation are illegal or fraudulent; or
(E) The corporate assets are being misapplied or wasted. . . .

**53.** The record reflects that the corporation was suspended by the State of Maine, pursuant to 13–A M.R.S.A. § 1301, as a result of its failure to file an annual report. Tr. Vol. I at 69, 331.

**54.** Salterio's tax returns are in evidence as Exhibits 38A–43A.

**55.** The Court has little doubt that had it been to Salterio's advantage to do so, Salterio would have invoked the corporate form to avoid liability, and the Court, therefore, emphasizes that: "[i]n choosing the corporate form, [he] has reaped its benefits; he may not now disregard its existence in order to avoid its disadvantages." *Ferrer v. Carricarte*, 751 F.Supp. 1032, 1034 (D.P.R.1990) (citing *Terry v. Yancey*, 344 F.2d 789, 790 (4th Cir.1965)).

The directors and officers of a corporation shall exercise their powers and discharge their duties in good faith with a view to the interests of the corporation and of the shareholders and with that degree of diligence, care and skill which ordinarily prudent men would exercise under similar circumstances in like positions.

13–A M.R.S.A. § 716. Under the statute, "good faith" means "honesty in fact in the conduct or transaction concerned; and in the case of an officer or director, [good faith] also requires the exercise of reasonable business judgment after reasonable inquiry into the facts." 13–A M.R.S.A. § 102(14). Specifically, a corporate director's duties of care and loyalty to the corporation and its shareholders include the obligation to:

disclose and not withhold relevant information affecting the status and affairs of the relationship; [and] [t]o not use [his] position, influence or knowledge respecting the affairs and organization that are subject to the relationship to gain any special privilege or advantage over the other person or persons involved in the relationship.

*Thompson's Point, Inc. v. Safe Harbor Development Corp.*, 862 F.Supp. 594, 599 (D.Me.1994) (quoting *Rosenthal v. Rosenthal*, 543 A.2d 348, 352 (Me.1988)).

■ Lichtenstein argues that Salterio, had a fiduciary duty under § 716, as President and majority shareholder, and that Salterio breached this duty by diverting corporate profits for his own personal uses and thereby converting assets or business opportunities of the minority shareholders. Among the actions Lichtenstein cites as evidence of such conversion are: (1) taking control of Consolidated's cash flow to relieve his personal financial pressure in 1990 by terminating Lichtenstein and retaining roughly $45,000 per year for himself; (2) taking a $10,000 loan from Consolidated for his other business, Caribbean Coffee; and (3) failing to account for the use of profits earned from customers such as Sunroc. As emphasized above, the Court is unable to discern from this record how much money Salterio, retained for his own purposes. Lichtenstein concedes that the only evidence in the record of Salterio's handling of Consolidated's assets are Salterio's own financial summaries. In view of the Court's finding that Salterio's testimony was not wholly credible, the Court finds this evidence to be of little use.

For the same reasons articulated above in Count V of the individual action, the Court finds that Salterio breached his fiduciary duties to the other shareholders. The Court will, therefore, enter judgment in favor of Lichtenstein on Count I of the derivative action. The Court reserves decision, however, on the issue of determination of any recovery of damages,[56] until completion of liquidation. It appears to the Court to be likely that in a proper resolution of the issues in the liquidation of the corporation, the damages issues remaining to be resolved in the derivative action will likely be mooted because any shareholders having claims in the derivative action will also be the only shareholders who will participate in the resolution of the individual action, and all of their claims and interests against the corporation and Salterio are likely to be resolved therein.

*Count IV: Appointment of a Receiver*

Lichtenstein seeks appointment of a receiver, pursuant to Rule 66 of the Federal Rules of Civil Procedure, to calculate gross profits. Lichtenstein alleges that Salterio took $596,352 out of the business between 1991 and 1996 and that gross profits from 1991 until 1996 were $1,138,045. The Court, having previously determined that dissolution will be ordered and that a receiver will be appointed pursuant to Lichtenstein's claims on Counts IV and V of the individual action, concludes that this claim is now moot.

### III. CONCLUSION

Accordingly, it is hereby *ORDERED* that judgment shall enter for Salterio, Butera, and Consolidated on Count III of the individ-

---

**56.** The Court notes that Lichtenstein seeks recovery of all profits inappropriately diverted, while Salterio argues that he should, at most, be required to repay only the amount considered to be "excess" salary. The Court reserves decision on the legal aspect of this issue until after the pertinent factual issues have been addressed in the course of the dissolution and appointment of a receiver.

ual action; for Lichtenstein on Counts IV and V of the individual action; for Lichtenstein on Count I of the shareholder derivative action; and Count IV of the shareholder derivative action is dismissed as moot. The parties are hereby ORDERED to file with the Court, within twenty (20) days, written memoranda outlining the procedures for appointment of a receiver, and the payment of costs of that receiver, and proposing a list of three (3) agreed-upon individuals qualified to serve as the receiver, from whom the Court may appoint a receiver with the consent of the parties. At that time, the Court will schedule a conference on the matter, and the Court will proceed to appoint a receiver in order to resolve any issues as to liquidation of the corporation.

So *ORDERED.*